J-S44018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| RICO GREEN | |
| Appellee | No. 1878 WDA 2013 |

Appeal from the Order November 14, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0003610-2013

BEFORE: BENDER, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.                    **FILED AUGUST 08, 2014**

The Commonwealth of Pennsylvania appeals from the order of the Court of Common Pleas of Allegheny County granting Rico Green's motion to suppress all evidence obtained after Green was stopped by police on the streets of Pittsburgh. After careful review, we reverse.

On September 13, 2012, Officers Mark Goob, Edward Fallert and Michael Hoffman were on plain-clothes duty in an unmarked car driving toward the Northview Heights neighborhood of Pittsburgh due to recent complaints of drug activity and gun violence. While driving, Officer Fallert observed Green walking on the sidewalk toward their vehicle. Officer Fallert testified that Green was wearing a white t-shirt and sweatpants with an elastic waistband, and stated that he thought Green might be carrying a gun. Officer Goob then noticed a bulge in the front section of Green's

waistband, and Officer Fallert slowed the vehicle, eventually coming to a stop. Green stopped walking, and Officers Goob and Hoffman jumped out of the vehicle.

Officer Goob started walking toward Green, displaying his badge, and stated, "Hey, Pittsburgh Police, can you come here for a second." Trial Court Opinion, 11/13/14, at 2. Green stopped and looked around for a moment from his stationary position. Officer Goob moved closer to Green, and was able to see the bulge more clearly. Officer Goob then asked Green if he was carrying a gun, but Green did not respond. Officer Goob advised Green that he was going to pat him down. Officer Goob then touched the bulge on Green's waistband, and "his tactile sense [told] him that it [was] the 'handle of a gun.'" *Id.* Officer Hoffman then handcuffed Green, and Officer Goob lifted Green's t-shirt to reveal a Smith and Wesson firearm loaded with nine bullets.

On July 3, 2013, Green filed a timely pre-trial motion to suppress all evidence. On July 24, 2013, the court held an evidentiary hearing on the motion, and on November 14, 2013, the court granted the motion. The Commonwealth filed a timely Notice of Appeal on November 26, 2013. On December 4, 2013, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the Commonwealth did so on December 24, 2013.

On appeal, the Commonwealth raises the following issue:

Whether the suppression court erred in concluding that the police did not have reasonable suspicion to approach [Green], who displayed a bulge in his waistband that the officers believed was a firearm, to inquire whether he possessed a firearm, but then patted him down when [Green] did not answer the officer's question regarding the presence of the gun?

Brief of Appellant, at 4.

When reviewing a trial court's order granting a motion to suppress, our standard of review is as follows:

[W]e are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate. In conducting our review, we may only examine the evidence introduced by appellee along with any evidence introduced by the Commonwealth which remains uncontradicted. Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them. Our scope of review over the suppression court's legal conclusions, however, is plenary.

***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1107 (Pa. Super. 2012).

Before reviewing the issue presented by the Commonwealth, this case warrants an inquiry into the level of police-citizen interaction involved. Fourth Amendment jurisprudence recognizes three levels of police-citizen encounters:

The first [level of interaction] is the "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

- 3 -

*Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa. Super. 2005). The trial court held, and all parties agree, that Green's encounter with the police began as a mere encounter, when Officer Goob stated, "Hey, Pittsburgh Police, can you come here for a second," and then rose to the level of an investigative detention when Officer Goob informed Green that he was going to pat him down. Trial Court Opinion, 11/13/14, at 5; Brief of Appellant, at 12; Brief of Appellee, at 8, 18, 25. Based on the undisputed fact that Green was subject to an investigative detention, the Commonwealth was required to prove that the officers had reasonable suspicion of criminal activity at the time they patted Green down. *Id.* at 1146.

In evaluating whether an officer possessed reasonable suspicion to conduct a search, the trial court must:

> [E]xamin[e] the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. Thus, to establish grounds for reasonable suspicion, the officer whose impressions formed the basis for the stop must articulate specific facts which, in conjunction with reasonable inference derived from those facts, led him reasonably to conclude, in light of experience, that criminal activity was afoot.

*Commonwealth v. Cottman*, 764 A.2d 595, 598-99 (Pa. Super. 2000). Further, "when assessing the reasonableness of an officer's decision to frisk a suspect during an investigatory detention, an appellate court does not consider the officer's unparticularized suspicion or hunch, but rather the specific reasonable inferences which he is entitled to draw from the facts in

light of his experience." ***Commonwealth v. Stevenson***, 894 A.2d 759, 772 (Pa. Super. 2006) (quotations omitted).

Here, the trial court based its conclusion that Officers Goob and Fallert lacked reasonable suspicion to conduct the search on the belief that the officers failed to prove the requisite training and experience to determine that: 1) the encounter took place in a high crime area; or 2) that Green possessed an illegal firearm based on the bulge in his pants. We disagree. At trial, Officers Goob and Fallert both testified that they received Top Gun training[1], and Officer Fallert testified that he also received training from the Bureau of Alcohol, Tobacco and Firearms (ATF) in characteristics of armed individuals, how they conceal their weapons and their mannerisms. N.T. Suppression Hearing, 7/24/13, at 23, 38-39. Both Officers Goob and Fallert also testified that they have made thousands of gun arrests throughout their respective twelve and twenty years of experience on the police force. ***Id.***

Further, Officers Goob and Fallert testified that they had experience in the particular neighborhood of Northview Heights, given their assignment to a team charged with combating the high levels of drug and gun activity present there. ***Id.*** at 23. The evidence of record in the instant case is

_____

[1] The Top Gun training program is a drug enforcement training program designed for the investigator and prosecutor that highlights various stages of a typical drug investigation from the time the initial information is received through the resulting search warrants. Pennsylvania Narcotic Officers' Association, *available at* www.pnoa.org/topgun.html (last visited on 7/17/2014).

almost identical to that which was present in **Stevenson**, **supra**, and which this Court deemed sufficient to establish requisite training and experience. As such, the record does not support the trial court's determination that Officers Goob and Fallert lacked the necessary training and experience to identify gun-related criminal activity. **Gutierrez**, **supra.**

Accordingly, we must turn to whether the officers had reasonable suspicion to conduct the search, based on their training and experience. At trial, Officer Fallert testified that while driving the unmarked police vehicle, he observed Green walking on the sidewalk and saw "a bulge consistent with when [he] tuck[s] [his] firearm into [his] waistband." N.T. Suppression Hearing, 7/24/13, at 40. He stated that the way Green was carrying the gun is the "most common way people carry illegal firearms." **Id.** Further, he testified that Green did not appear to be of legal age to carry a firearm. **Id.** At trial, Officer Goob testified that after Officer Fallert alerted him that he believed Green was carrying a gun, he exited the vehicle, and once he was within a few feet of Green, he "could see the object in his waistband more clearly, and it resembled a handgun . . . so [he] asked him if he was armed." **Id.** At that point, Officer Goob advised Green that he was going to pat him down. As such, this is the point at which Officer Goob was required to have reasonable suspicion of criminal activity. **Bryant**, **supra.**

Based on this testimony, Officers Goob and Fallert both offered "specific and articulable facts" to support their "objective and particularized" suspicion that Green was in possession of a firearm. **Cottman**, **supra.**

Accordingly, the trial court erred in granting Green's motion to suppress, as the record does not support the trial court's finding that Officers Goob and Fallert lacked reasonable suspicion to conduct the search. ***Gutierrez***, ***supra.***

Order reversed. Case remanded for proceedings consistent with the dictates of this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2014

# IN THE COURT OF COMMON PLEAS
## OF ALLEGHENY COUNTY

COMMONWEALTH
of PENNSYLVANIA

CRIMINAL DIVSION

v.

CC# 2013-03610

RICO GREEN,

Defendant.

Amanda Sorrell, *Assistant D.A.*
Matthew Ness, *Defense Counsel*

## OPINION

By all accounts, September 13, 2012 was an ordinary day for Rico Green and some City of Pittsburgh police officers. That is until their paths crossed on a street near the Northview Heights housing complex. This interaction led to Green being charged with two crimes: carrying a firearm without a license, 18 §6106, and being a person not to possess a firearm 18 §6105(a)(1), (c). Seeing this firearm as a common denominator, Green sought to exclude it from the Commonwealth's evidence. He claims law enforcement "did not have reasonable suspicion to believe Mr. Green was engaged in criminal activity to perform an investigatory detention". *Motion for Suppression,* ¶ 4(a), (July 3, 2013). He also claims law enforcement did not have sufficient "facts to support a *Terry* frisk" "after he was illegally detained." Id., 4(b). As a result, Green seeks to suppress a Smith & Wesson 9mm

Appendix A

1

pistol, a magazine with 9 rounds of ammunition, and a clear, knotted baggie-corner of marijuana. Id.[1]

On July 24, 2013, the Court held a hearing on Green's assertion of illegality. The government elicited testimonial evidence from Mark Goob and Edward Fallert, both City of Pittsburgh law enforcement officers.[2] The defense presented the rather brief oral testimony of Green. The record was then closed and a briefing schedule was issued. The Government, the party with the burden of proof, filed first followed by Green's written argument on October 17, 2013. The matter is now ripe to resolve.

As I begin the 6th year of my service to the 5th judicial district of Pennsylvania, I have come to realize, and I apologize for stating the obvious, that ordinary and mundane facts are often a foundation for applying the subtle nuances of our constitutional protections. The principle at stake here is the right of everyone to be free from unreasonable conduct by law enforcement personnel.

Officers Mark Goob and Edward Fallert are working a plain clothes detail in an unmarked car. SHT, 5. Fallert is driving. SHT, 6. Goob is in the back seat. Id. Their destination was Northview Heights. Why ? There have been recent complaints of drug activity and gun violence. SHT, 6, 22. From the driver's seat, Fallert sees Green walking on the sidewalk toward the unmarked police car. SHT, 23.[3] Green is to the left of the car. SHT, 7. He is wearing a white t-shirt and sweatpants. Id. The pants have an elastic waistband. Id. Fallert tells his fellow officers in the car, "I think that kid might be carrying a

---

[1] The desire to seek exclusion of the marijuana is quite curious given that the Commonwealth has not charged Green with any such offense. See, Information.

[2] The government also had an exhibit admitted. It was a crime lab report confirming operability and barrel length. Despite its lack of relevance to the constitutional issues involved, the Court, hearing no objection, admitted the document. Suppression Hearing Transcript, ("SHT"), pg. 26-27, (July 24, 2013)([filed August 14, 2013 with a tracking number of T13-1697).

[3] At the time of observation, law enforcement did not know the person was Green. The proper name is being used to promote clarity.

2

gun." Id. Goob sees a bulge in the front/middle section of the waistband. Id. The car slows down. It then stops. SHT, 8. Green stops walking. SHT, 7. Goob and the front seat passenger, Officer Hoffman, jump out. SHT, 24. Goob's badge comes out. It is displayed over his shirt on his chest. SHT, 9, 15. Goob starts to walk toward Green. Id. "Hey, Pittsburgh Police, can you come here a second?" Id. Green stops. From his stationary position, he begins to look in different directions. SHT, 9, 12, 15. Goob closes the gap. He is just a few feet away. Id. He can now see the bulge more clearly. It "resembled a handgun." SHT, 9. Goob asks, "Are you armed?" Green does not answer. Goob then tells Green that he is "going to pat [him] down." SHT, 9. Goob touches the bulge. His tactile sense tells him it is the "handle of a gun". Id. Green's arms are secured by Goob. Officer Hoffman handcuffs Green. Goob then lifts up the T-shirt. A gun is in Green's waistband. The Smith & Wesson firearm is taken. SHT, 9. It is loaded with 9 bullets. Id.

These facts shape the conclusions of law the Court reaches. Two preliminary matters – standing and expectation of privacy – do not detain us very long. Pennsylvania gives Green automatic standing for possession based crimes. Commonwealth v. Sell, 470 A.2d 457 (Pa. 1983). A gun was removed from the waistband of his pants. Green had an expectation of privacy in the clothes that he was wearing. In addition, society would deem such a privacy interest to be reasonable. The Court concludes Green has standing and he has the necessary expectation of privacy.

Green's request to exclude certain items is headquartered on the 4th Amendment to our U.S. Constitution and Art. 1, Section 8 of our state constitution. Green and the government do not advocate for a separate analysis under each constitutional provision. That was wise considering Pennsylvania follows *Terry v. Ohio* including the focus on all of the circumstances. Commonwealth v. Hicks, 253 A.2d 276 (Pa. 1969); Commonwealth v. Freeman, 757 A.2d 903, 908 (Pa. 2000).

The 4th Amendment to the United States Constitution protects individuals from "unreasonable searches and seizures" of "their persons, houses, papers, and effects." U.S. Const. amend. IV. Because of the Amendment's language, Courts often use the phrase "search and

3

seizure" when evaluating the Fourth Amendment. But in many occasions, as is the case here, the legal analysis is flipped; we begin with whether an individual was seized, and, if so, whether the search that followed was valid.

Generally speaking, the Fourth Amendment has a preference for a warrant based on probable cause to justify a seizure or search. Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *Terry* held, however, that Fourth Amendment seizures can be legal without a warrant in certain circumstances, including brief investigative detentions. Id. at 20. A warrantless Fourth Amendment seizure needs an objective and particularized justification. United States v. Mendenhall, 446 U.S. 544, 551, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

The first step in a 4th Amendment analysis is to determine whether and when a citizen-police encounter implicates the Fourth Amendment. "Before even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] 'seized' by the police" within the meaning of the Fourth Amendment. United States v. Crandall, 554 F.3d 79,84 (3d Cir. 2009). The Supreme Court has made clear that a Fourth Amendment "seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). These encounters of short duration that do not amount to Fourth Amendment seizures can be characterized as "consensual" because the citizen has the ability to engage in or terminate the encounter. *See,* United States v. Wilson, 413 F.3d 382,386-87 (3d Cir. 2005)(determining whether the further questioning by the police officer after issuing a traffic citation was a consensual encounter or a Fourth Amendment seizure). "When an encounter is consensual, no reasonable suspicion is required." United States v. Kim, 27 F.3d 947,950 (3d Cir. 1994).

In <u>California v. Hodari D.</u>, 499 U.S. 621, 627, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the Court ruled a seizure "requires either physical force . . . or, ..., submission to the assertion of authority." 499 U.S. at 626. The physical force predicate, at least in the 3rd Circuit, has been interpreted to mean the "laying on of hands". <u>United States v. Waterman</u>, 569 F.3d 144,145 (3d Cir. 2009). Whereas, the "submission to authority" predicate has come to mean "that a suspect manifest compliance with police orders." <u>Id</u>., at 146 (citations omitted).

Green was seized under the second prong of this definition. Green stopped in response to the command to "come here". After not responding to a question, Green is then told he will be "patted down". Green submitted to law enforcement's exercise of their authority and, as a result, was seized.

Having pinpointed when Green was seized, the next area of inquiry is whether that seizure was justified. Under *Terry*, a police officer may conduct a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot". <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In determining whether there is reasonable suspicion, a Court must examine the totality of the circumstances and consider both a "particularized and objective basis for suspecting the particular person stopped of criminal activity" as well as, a trained officer's commonsense judgments and inferences about human behavior. <u>United States v. Cortez</u>, 449 U.S. 411,417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Pertinent factors may include whether the area is a high-crime area, a suspect's nervous or evasive behavior, and flight from police officers. <u>Wardlow</u>, 528 U.S. at 124.

The sum total of the circumstances of this interaction show reasonable suspicion was not present. At no time did Green run from these two police officers who just jumped out of a car and approached him.[4] The location is not the persuasive kernel of evidence the government subscribes to it. Officer Goob stated his opinion, colored by

---

[4] The absence of flight here really weakens the government's reliance on <u>Commonwealth v. Cook</u>, 735 A.2d 673 (Pa. 1999).

his training and experience, that the area is a "high crime area". SHT, 8. The difficulty the Court has with believing this aspect of the government's presentation is the lack of precision coupled with the absence of objective and verifiable data. The interaction with Green took place in Northview Heights around the 500 block of Mount Pleasant. SHT, 6. What is the geographical boundaries of the "high crime area" the government is relying upon? Is it the entire Northview Heights area? Is it various blocks of certain streets? How many incidents were there on Mount Pleasant street in the 6 months leading up to the interaction with Green? How does the Mount Pleasant street experience compare to other nearby locales? Is it truly a "high crime area" or perhaps just a "high drug crime area" or a "high gun crime area"? While the Court has raised several questions regarding the moniker "high crime area" as it relates to this case, the reader should have no misunderstandings. The government has just not proven to this fact finder's satisfaction that the 500 block of Mount Pleasant street was a high crime area on September 13, 2012. Its failing is attributed to the lack of objective and verifiable data underscoring the opinion evidence presented by the law enforcement witness. Without the supporting data, the Court does not believe the opinion proffered by the government's witness.[5]

---

[5] An undercurrent to the Court's thinking is how the phrase "high crime area" has almost become outcome determinative. See *Curtis v. United States, 349 A.2d 469, 472 (D.C. 1975)* ("We eschew the notion that the above facts assume added significance because they happen to have occurred in a high crime area. This familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct.").

Case in point is *Commonwealth v. Fink*, 700 A.2d 447 (Pa. Super. 1997). After reviewing certain factors, the *Fink* panel said, "[t]hese factors, coupled with the fact that the incident occurred in the early morning hours, in an area well-known for criminal activity, are more than sufficient to establish reasonable suspicion justifying Officer Whiteman's stop of appellant." Id., at 449. Absent from the *Fink* opinion was any reference to the facts made in the trial court regarding the conclusion that the area was a "high crime area". Were there facts put forth in the trial court on this constitutionally significant issue or was it a conclusion reached by the trial court which the *Fink* panel just adopted as their own ?

6

The government also relies upon the officer's training as a means to justify the *Terry* stop. In the 6 years of adjudicating criminal cases, the Court has heard several officers talk about the training they have received on the topic of "Characteristics of an Armed Person". It has become so common, with almost identical oral refrains, and training which almost magically matches the factual scenario they encountered, that the believability of this evidence is just not there. The government did nothing to bolster the believability of this training. It basically said, the officer has this training, and you should believe it. While this may have been the Court's reaction the first time or two that it heard such evidence, it will not happen here. The Court was not presented with any certificate of completion. The Court was not presented with a syllabus or course outline of the training session. The Court did not hear from the instructor of the course. The Court does not know if the training was 10 minutes at roll call one morning or was it a sit-down lecture for 3 hours on some day off. For a finding of fact that is so critical to the government's attempt to say the officer's conduct was consistent with the constitution there needed to be more.

Because the Court has found a lack of reasonable suspicion to believe criminal activity was happening, our focus must turn to the applicable remedy. Our task is made much easier because the government does not advance any alternative argument. Nowhere does it say that just because there was a 4th Amendment violation, the remedy of suppression is not automatic. Therefore, the need to balance the social costs and the deterrent effect to determine if exclusion of the evidence is proper will await another day. *See,* Herring v. United States, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); Wong Sun v. U.S., 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The conclusions of law reached above remain consistent and true to the body of precedent that has played out in this courtroom. On 7 prior occasions, this Court has addressed similar street level encounters with law enforcement personnel involving a gun. A listing of these decisions follows : Commonwealth v. Prilo, 200916585, Opinion, (July

30, 2010); <u>Commonwealth v. Davis</u>, 200907707, Opinion, (Jan. 4, 2011)[6]; <u>Commonwealth v. Stevens</u>, 201014549, Opinion (Sept. 27, 2011)[7]; <u>Commonwealth v. Whitley</u>, 201111334, Opinion (May 8, 2012); <u>Commonwealth v. Watkins</u>, 201111679, Opinion (Sept. 14, 2012)[8]; <u>Commonwealth v. Wilson</u>, 201213348, Opinion (April 22, 2013)[9]; and, <u>Commonwealth v. McGuire</u>, 201201525, Opinion (April 23, 2013)[10]. A chronological review of this precedent demonstrates the subtleties involved in the delicate balancing of our constitutional protections.

The Court's first decision, from a chronological view, that bears some study is *Prilo*. The *Prilo* facts are similar to the present matter with one notable exception.[11]

> A few ticks before midnight on October 26, 2009, Burford and Craig, both City of Pittsburgh police officers, are riding in a police vehicle. They had just completed a right-hand turn from Negley Avenue onto Hayes Street. Suppression Hearing Transcript (SHT"), pg. 6. Burford is driving. On the sidewalk to their right is Prilo. He is walking towards the police vehicle. SHT, 14. He is wearing a brown hooded sweatshirt. Burford sees the right pocket of Prilo's sweatshirt "hanging lower than the left side." <u>Id</u>. It was not a slight difference but the right pocket area was "substantially lower than his left pocket." <u>Id</u>. Upon getting closer to Prilo, Burford saw Prilo take "his right hand and shove[ ] it into his right pocket and pushed his right pocket into his belt line" near his hip. <u>Id</u>., at 7. Burford announces to his partner, "I

---

[6] The government filed a nolle prosequi on January 25, 2011.

[7] The government filed a nolle prosequi on October 12, 2011.

[8] The government filed a nolle prosequi on September 17, 2012.

[9] The government filed a nolle prosequi on April 22, 2013.

[10] The government filed a nolle prosequi on June 30, 2013.

[11] The few footnotes from <u>Prilo</u> are not included.

think he has a gun." Id., at 7, 14. Prilo continues walking. The police circle the block. Prilo is still in the area. He is still walking. This time Prilo is on the driver's side of the police vehicle. Id. Prilo is parallel with Burford. Prilo is right outside the driver's side window. Burford stops the car and asks Prilo to stop for a moment. SHT, 18. "Heard any gunshots ?", Burford asks Prilo. Id. Burford sees Prilo pivot his right hip area away from Burford. The manner of turning was not "natural". Id., at 8. Simultaneously with this movement, Prilo's hand goes into his pocket and is "holding [that area of clothing] toward his body." SHT, 14. Burford and his partner begin to exit the vehicle. They hear no verbal response to the question. SHT, 18. Prilo runs away. SHT, 15, 18. Prilo's flight is followed by foot pursuit and numerous commands to "stop, police". Id., 9, 15. Prilo did not listen. While running behind Prilo, the officers see his "right hand in his pocket", Id., 8, 16, but the left arm was pumping freely in a normal running motion. Id., at 8. During the pursuit, Craig sees Prilo make a "throwing sideward movement with his right arm", Id., 16, and soon thereafter, Prilo trips and falls to the ground. Id. Craig tells him to stay put and put his hands out to his side. Id. That instruction was not followed. Craig uses his baton to extract compliance. Id. Prilo is then handcuffed. Id., 12, 16, 17.

Prilo, 200916585, Opinion, pgs 3-4 (July 30, 2010).

In the case of *Davis* he sought to exclude a gun from the evidence gathered by City of McKeesport police officers. The following is the factual rendition used in that decision minus the footnotes.

It is the first of May, 2009, around 2:40 in the morning. Police officer James Lane is working the night shift for the City of McKeesport. He knows the place well. He has patrolled its borders for 17 years. Recently, the police department had received reports of criminal mischief inside the 6th Street parking garage. The garage is in the business district of this once thriving community at the intersection of the Monongahela and Youghiogheny rivers. Officer Lane was riding through the multi-story garage when he heard gunshots. He stopped his car. He

9

listened. Where were the shots coming from, he thought. He radioed for help. He heard five shots maybe as many as 15. He began to descend from the 3rd floor, looking and listening for any clues along the way. He reaches the exit in maybe 20 seconds. He sees nothing. He hears nothing. Then, off in the distance, maybe 75 yards away and down an alleyway, he sees two people walking away from his location. All he can determine is one is a man and one is a woman. It appears as if the man is carrying a bag of some sorts. Office Lane makes a right turn out of the garage and then a quick left to go down the alleyway. He then sees a fellow officer approach the couple from the other direction. Lane orders the newly arriving and much closer officer to stop and talk to the couple. Lane then backs out of the alley, returns to the garage area in a search for potential shooting victims.

One of several officers working the graveyard shift that first day of May is Officer Steve Kondrosky. When Lane's call - shots fired - was broadcast, Kondrosky was about 2 blocks away. The call was consistent with his auditory prowess as he had heard maybe 8 to 15 shots. He jumps into his car and speeds to the area. He sees two people, one of which is later identified as Antoni Davis, walking down an alley. He approaches from the opposite direction that officer Lane was heading. He pulls his police car up near them, gets out and asks them if they heard any gunshots within the past 30 seconds. Both say "no" and add that they had both just left a bar. Kondrosky finds the negative response to the gunshot question odd because it was 40 minutes past closing time. Kondrosky then asks: Do you have any weapons on you, anything that I should be concerned about? SHT, 26. Davis says, "No" as does his companion. Kondrosky then asks if he can check. He heard no response. Kondrosky repeats the request to check for weapons. Again, he hears no response. Almost simultaneously with Kondrosky asking for permission to search Davis for weapons, fellow Officer Rydzak arrived. Rydzak patted down Davis for weapons. The reason for the pat-down was officer safety. SHT, 26, 27. A firearm was found. Davis was detained.

Davis, 200907707, Opinion, pgs 2-4 (Jan. 4, 2011).

10

The 3rd opinion in this collection of precedent is <u>Commonwealth v. Stevens</u>. The first sentence crystallizes the issue:

> *"The tension between a citizen's right to be free from an unreasonable seizure and government's ability to approach any citizen while on a nighttime walk along a city street is what causes this opinion to be written."*

<u>Stevens</u>, 201014549, Opinion, pg. 1 (Sept. 27, 2011).[12] The *Stevens* facts are not far from the present facts.

On October 4, 2010, two City of Pittsburgh police officers are working the night shift. Their area of concern is a certain area of the Northside of Pittsburgh. They are working in plain clothes. They are in a vehicle devoid of police markings and lights. Around 10:20 p.m., their vehicle turns down Sampsonia Street. Officer Chris Vendilli is riding "shotgun." Vendilli's attention is drawn to Stevens. He is walking. His direction of travel is the same as the police car. He is wearing an oversized sweatshirt with one center pocket. His hands are inside the center pocket. As the vehicle closes the gap with Stevens, Stevens pivots and is now facing the approaching vehicle. Stevens does not stand still. He continues to walk backwards while attempting to peer into a slow moving vehicle on this deserted street. Upon Stevens' pivot and his walking backward, Vendilli now sees Stevens' hands giving the appearance of holding something around the center pocket of his hoodie. Vendilli now believes Stevens is armed. They want to speak with him. The unmarked police car comes to a stop. Vendilli jumps out. He is maybe 20 feet from Stevens. Stevens turns his back and begins to walk away from Vendilli and in the same direction the police car is heading. Vendilli's badge is dangling around his neck and bouncing off his chest as he attempts to catch up with Stevens. Stevens' pace quickens a bit but he is not running. "Hey, I need to talk with you!" says Vendilli. Stevens continues his pace. Vendilli now breaks into a

---

[12] The footnotes from <u>Stevens</u> are not included.

jog. He repeats his declaration, but adds, "Take your hands out of your pockets!" Stevens stops. He takes his hands from the center pocket of his hoodie. With the unmarked car now immediately adjacent to Stevens and Vendilli, Vendilli demands Stevens to put his hands on the police car. Stevens complies with the directive. Vendilli immediately asks if he has a firearm. Vendilli's partner is also asking that question. Stevens says, "Yes." SHT, 10. He was handcuffed. He was patted down. [A] large bulge in the front area of his pants was felt. Id. A .22 caliber gun with a barrel of almost 6 inches is recovered from "his waistband." SHT, 19.

Stevens, 201014549, Opinion, pgs. 2-3 (Sept. 27, 2011).

The case of *Whitley* is next. Like the present matter, it originates from the City of Pittsburgh.

Around 9:00 at night, Snyder and Goob are traveling in an unmarked car on North Homewood Avenue. Recently, they had received anonymous 911 calls about shots fired in that area. Near the intersection with Idlewild Street, they notice 3 males walking and talking near an empty lot. One is taller than the rest. He is wearing jeans and a white t-shirt and a black baseball hat. The tall person "looked like he had a weighted object in his right front pants pocket." SHT, 7. It caused "his pants to sag more on" that side. Id. As their undercover car slowly closed the gap, the tallest member started to walk a bit faster thereby separating himself from the others. SHT, 8. The officers stopped their car. They got out with their badges around their necks. SHT, 9. They were dressed in casual clothes not a standard police uniform. SHT, 22. Officer Goob said, "Pittsburgh Police." SHT, 17. This was followed by, "Do you mind if I talk to you?" SHT, 23. All three stop. The taller one, later identified as Andre Whitley, "actually turned around and started to walk back" toward Officer Goob. SHT, 17. His right hand was on the "outside of his right pants pocket." SHT, 18. Officer Goob directed Whitley to "move his hand away from his pocket." SHT, 19. Whitley did so. Officer Goob could now see a bulge, maybe 5 to 6 inches long. Almost

immediately upon moving his hand away from his pocket area, Whitley says, "I just found it." SHT, 19, 20, 23. Goob's response, "Is it a gun, and do you have a permit?". Whitley said, "Yes." Id., at 20. Goob takes a few steps closer to Whitley thinking the affirmative response was to the first question – do you have a gun. Goob asks, "[D]o you have a permit?", Id. "No" says Whitley. Id. Upon hearing that, Officer Goob grabs Whitley's belt, reaches into his pants pocket and removes a firearm. Id, 20-21.

Whitley, 201111334, Opinion, pg. 2 (May 8, 2012).

Our 5th decision on this issue, *Watkins*, is, again, a City of Pittsburgh case. The facts are as follows.

Anthony Watkins was enjoying his Saturday afternoon on July 30th last year. He was hanging out with two buddies, sitting on a guardrail near 402 Wheeler Street. Around 4:23 that afternoon, his enjoyment was interrupted. Two City of Pittsburgh police officers approached the group. They had just exited their patrol car. They walked toward the trio. By all accounts, neither Mr. Watkins nor his companions were doing anything wrong. While that may have been the case, the officers were still concerned. Their experience with the location contributed to the dynamic. Officer Michael Flynn has been called to that "area several times for shots fired, call for narcotics activity, [and] illegal activity in general." Suppression Hearing Transcript, (SHT), 7 (July 27, 2012). Officer Flynn also told the Court about some specific instances regarding guns and that location. SHT, 6, 7. As the officers proceeded towards the trio, one of the group "lifted his shirt up and stated that he didn't have any weapons on him." SHT, 9. Officer Flynn recognized this person as being in a vehicle, a month earlier, where a gun was seized. Id. Immediately after this revelation, Flynn's attention shifted to Mr. Watkins. Flynn's partner, Lance Hoyson, was focused on the 3rd member of the guardrail sitting group. As Flynn got closer to Mr. Watkins, Watkins "stood up" and positioned his body in a way that Watkins' right side (i.e. hip area) was furthest away while Watkins' left side (i.e. hip area) was closest to Officer Flynn. SHT, 11, 12. In

making this maneuver, Officer Flynn "saw an unnatural bulge on the right-hand side of his body." SHT, 12. Flynn became "nervous that [Watkins] might have a concealed weapon." Id. In Flynn's eyes, Watkins was reaching for something. He was inches from Watkins. SHT, 13. Flynn yells, "Stop". The oral command was accompanied by Flynn grabbing Watkins' arm and pushing it away. SHT, pg. 12, 32. Flynn then felt that same area. He actually put his "hand on it and [ ] felt [it]." SHT, 13. The "it" was a gun. Id. At this juncture, Watkins pushed away and took the preliminary steps to run. He didn't get far. He tripped almost immediately. He fell. "I give up" was the next thing heard from Watkins. SHT, 13. A firearm was recovered. Watkins was arrested.

Watkins, 201111679, Opinion, pgs. 1-2 (Sept. 14, 2012).

The next decision in the sequence of our own decisional history is *Wilson*. It comes from Forest Hills.

Officer Sharp was told some information by an anonymous motorist that caused him to head in the direction of Yost Blvd. from his location on State Route 30, which is also known as Ardmore Boulevard. The information was: black male, dark clothing, walking on Yost Blvd towards Ardmore and appears to be staggering and possibly intoxicated. SHT, pg. 7. Armed with this information, Officer Sharp heads to Yost Blvd. Yost Blvd. is a two lane, asphalt road, one lane heading south and the other heading north. SHT, pg. 9. There are no sidewalks on either side. Id. It was dark out. As Officer Sharp makes somewhat of a blind bend in the road, he "encounters a male" walking towards him. SHT, pgs. 8, 18. The black male, later identified as Wilson, is close to the white, fog line but still on the roadway. SHT, pg. 10. Sharp stops his car. He makes no observations that Wilson was staggering or showing signs of being drunk. SHT, pg. 18. He exits his police car. Wilson removes both hands from his pants pockets. SHT, 19. Officer Sharp characterizes that movement as Wilson

"push[ing] his right hand" towards his right hip area on the exterior part of his "dark" hooded sweatshirt. SHT, 11. Officer

14

Sharp, now 2 feet from Wilson, "told [Wilson] to put his hands on the police vehicle." SHT, 12. Wilson did not respond as fast as Officer Sharp would have liked. So, Officer Sharp grabbed Wilson's "right hand from his waist area and placed his right hand onto the police vehicle." SHT, pg. 13. Upon doing so, Officer Sharp was now, in a position, to see a "bulge" in the right hip area "where his hand was". SHT, pgs. 13, 14. Wilson's left hand then followed his right hand onto the police car. During this rapid sequence of events, Officer Sharp detected no odor of alcohol about Wilson's person. SHT, pg. 18-19. Officer Sharp then asked Wilson if he had anything on him. Wilson told him "he had a gun in his right waistband." SHT, pg. 15. Officer Sharp then "removed a 9-millimeter Beretta." SHT, pg. 15.

Wilson, 201213348, Opinion, pgs. 3-4 (April 22, 2013).

Our final decision in this finite area of search and seizure law comes from Wilkinsburg. The facts in *McGuire* are set forth below.

Wilkinsburg Police Officer Hamlin is on duty in a marked police car. A minute or two before 11 p.m., on Saturday, October 1st, his radio comes alive: 913 Ross Avenue for a possible burglary, possible home invasion with a window broken out and a woman screaming. Suppression Hearing Transcript, ("SHT"), page 6 and 14 (October 10, 2012). He is a short distance away; maybe a block. Id, 7. Once there – the 900 block of Ross – he sees "two individuals walking in front of 913 Ross Avenue" Id, 7, 8, but on the other side of the street and on that sidewalk. Id, 17. Both were in dark clothing. Id, 17. The two people continue walking. Every so often, both looked over their shoulders at the very slow moving police car. Id, 18, 19. Hamlin followed both of them for 2 to 3 minutes. Id, 12. Once his fellow officer arrives, Hamlin parked his car. He got out. He is 10 feet away. Id, 10. He tells both people "to stay where they were" because he needed to talk with "them about a burglary". Id, 9, 10. One of them, later identified as McGuire, starts to walk backwards. Id, 10.

Immediately, Hamlin draws his "Taser" and yells "stop". Id, 10. McGuire pivots and turns away from the officer. Id. Hamlin

15

"deploys[s] his taser". Id. The force drops McGuire to the ground. Id, 11. Hamlin handcuffs him. Id. In the process of lifting McGuire from his prone position, "a loaded 9mm handgun fell out of [McGuire's] waistband." Id, 11.

McGuire, 201201525, Opinion (April 23, 2013).

This collection of precedent allows for some themes to evolve that are critical to the two line of cases that have developed. The one fraternity is made up of *Prilo* and *Whitley*. Looking at these two decisions you have something "extra" that gave the officer the impetus to escalate the matter from a mere encounter to an investigative detention supported by reasonable suspicion. In *Prilo*, it was flight. In *Whitley*, it was the citizen's own words. The other group, made up of *Davis, Stevens, Watkins, Wilson* and *McGuire*, lack the collection of circumstances to justify a conclusion that criminal activity was present.

In conclusion, the interaction with Green began as a mere encounter but quickly morphed into an investigative detention. However, that enhanced level of intrusion was not accompanied by the requisite level of circumstances which would lead a reasonable person to believe that Green was engaged in criminal activity.

An order consistent with the conclusions reached here will also be issued.

BY THE COURT :

Joseph K. Williams, III

16